UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| CAUDILL SEED & WAREHOUSE CO., INC., | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counter Defendant, | ) | |
| | ) | |
| v. | ) | 4:09-cv-101-WGH-RLY |
| | ) | |
| ROSE SEEDING & SODDING, INC., and | ) | |
| MARK ROSE, Individually and as President | ) | |
| of Rose Seeding & Sodding, Inc., | ) | |
| | ) | |
| Defendants and | ) | |
| Counter Claimants. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I.    Introduction

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge[1], on Plaintiff's Third Motion for Summary Judgment

filed September 1, 2010. (Docket Nos. 124-25). Defendant filed a Response on

September 27, 2010. (Docket No. 132). Plaintiff filed its Reply on October 4,

2010. (Docket No. 138).

## II.    Facts

---

[1]On August 17, 2010, the parties consented to Magistrate Judge jurisdiction in
this case. (Docket No. 120). Chief U.S. District Judge Richard L. Young entered an
Order of Reference on August 18, 2010. (Docket No. 121).

For the purposes of this motion for summary judgment, the facts in the light most favorable to the non-moving party are as follows:

1. Plaintiff Caudill Seed & Warehouse Co., Inc., ("Caudill Seed") is a Kentucky corporation with its principal place of business at 1402 West Main Street, Louisville, KY 40203. (Amended Complaint ¶ 1). Defendant Rose Seeding & Sodding, Inc., ("Rose Seeding") is an Indiana corporation with its principal place of business at 3718 Crescent Road, Charlestown, IN 47111. (*Id.* ¶ 2). Defendant Mark Rose is an Indiana resident. (*Id.* ¶ 3).

2. Caudill Seed is engaged in the sale of seed, mulch, fertilizer, and related product. (Amended Complaint ¶ 8). Rose Seeding is engaged in the landscaping business; Mr. Rose is the president and/or CEO of Rose Seeding. (*Id.* ¶¶ 9-10).

3. Between 2006 and 2009, Rose Seeding purchased seed and other related goods from Caudill Seed. (*See* Affidavit of Keith Vissing ("Vissing Aff.") ¶ 3).

4. In late 2007, Mr. Rose signed a credit application (hereinafter "Credit Application") agreeing to individual liability for sales made on credit from Caudill Seed to Rose Seeding. (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 1).[2]

5. On September 22, 2008, Rose Seeding purchased $10,811.00 of

---

[2]Mr. Rose has not disputed that he signed the Credit Application. (*Id.* Deposition of Mark Rose ("Rose Dep.") at 33-34).

product from Caudill Seed. On September 23, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*See* Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 2).

6. On September 24, 2008, Rose Seeding purchased $23,309.00 of product from Caudill Seed. On September 25, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Exs. 3, 4).

7. On September 30, 2008, Rose Seeding purchased $6,107.00 of product from Caudill Seed. On September 30, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Ex. 2).

8. On October 2, 2008, Rose Seeding purchased $7,543.98 of product from Caudill Seed. On October 2 and 3, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Exs. 4, 5).

9. On October 3, 2008, Rose Seeding purchased $2,417.00 of product from Caudill Seed. On October 7, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Ex. 3).

10. On October 10, 2008, Rose Seeding purchased $13,379.40 of product from Caudill Seed. On October 13, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 3).

11. On October 16, 2008, Rose Seeding purchased $9,564.24 in product from Caudill Seed. On October 17, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Ex. 3).

12. On October 20, 2008, Rose Seeding purchased $3,811.72 in product from Caudill Seed. On October 21, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Ex. 4).

13. On October 27, 2008, Rose Seeding purchased $5,655.20 of product from Caudill Seed. On October 28, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Exs. 3, 6).

14. On October 30, 2008, Rose Seeding purchased $6,838.60 of product from Caudill Seed. On November 3, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Ex. 2).

15. On November 4, 2008, Rose Seeding purchased $16,346.41 of product from Caudill Seed.[3] On November 5, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 3).

16. On November 6, 2008, Rose Seeding purchased $2,792.00 of product from Caudill Seed. On November 6, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.*).

17. On November 14, 2008, Rose Seeding purchased $2,885.20 of product from Caudill Seed. (*Id.*). On November 17, Rose Seeding purchased $271.25 of product from Caudill Seed. (*Id.* at Ex. 6). On November 17, 2008,

---

[3]A $5,726.40 credit was issued by Caudill Seed on this order for non-conforming goods (DOT-Mix seed). This reduced the value of that product to $10,620.01. Caudill Seed subsequently credited Rose Seeding for $5,726.40 for returned product. (*See Complaint* ¶ 44).

Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Exs. 3, 6).

18. On December 17, 2008, Rose Seeding purchased $1,320.00 of product from Caudill Seed. On December 17, 2008, Caudill Seed shipped and Rose Seeding accepted said product. (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 6).

19. On February 18, 2009, Rose Seeding purchased $4,766.67 of product from Caudill Seed. On February 19, 2009, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Ex. 4).

20. On February 20, 2009, Rose Seeding purchased $585.00 of product from Caudill Seed. On February 20, 2009, Caudill Seed shipped and Rose Seeding accepted said product. (*Id.* at Ex. 6).

21. These purchases amount to $43,131.33 worth of non-seed product and $69,545.94 worth of seed totaling $112,677.27. (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at 7, 9). No payments have been made for these orders. (*Id.*).

22. Defendants have not disputed that they received the product set forth in the invoices at issue herein, and applied the seed on various projects. (Rose Dep. at 37).

23. Caudill Seed alleges that the only notice Defendants gave to it that any of the product at issue herein constituted non-conforming goods pertained to seed contained in Order #366440, for which Rose Seeding was duly credited.

24. Defendants allege that the seed purchased on these dates failed to germinate. (Vissing Aff. ¶ 4).

25. Defendants further allege that, as a result of the failure to germinate, Rose Seeding was required to redo or overseed fourteen job sites. (Id. ¶ 4; Response at 3).

26. In order to remediate, Rose Seeding was required to repurchase fertilizer, netting staples, and tackifier. (Vissing Aff. ¶ 6).

27. Mark Wiley, a salesman for Caudill Seed, was notified of the germination problems. (*Id.* ¶ 7).

28. The invoices for the disputed product included a section entitled "Terms of Sale" which included various warranties and other terms. (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 10). Several of the sections within the Terms of Sale are relevant to this dispute. Specifically, the Terms of Sale explain that there is a specific manner in which Rose Seeding was to accept or reject "goods" as follows:

> INSPECTION; ACCEPTANCE; REJECTION: All goods tendered shall be inspected by Buyer within ten (10) days after receipt and, unless a notice of rejection[s] has been sent by Buyer to Caudill [Seed] within such ten day period, Buyer shall be deemed to have irrevocably accepted the goods. Goods which are rejected or subject of any claim [are] to be promptly set aside by Buyer in safe storage for inspection by Caudill [Seed]

(*Id.* at Ex. 10). Furthermore, the Terms of Sale provide specific warranties for "goods" as follows:

> WARRANTIES: Caudill warrants that the goods sold hereunder are

of merchantable quality and that Caudill can convey the title to the goods free of any security interest or other lien. Buyer agrees to hold Caudill harmless against any claims of infringement of any U.S. patent, trademark, or copyright on the goods arising out of compliance by Caudill with specifications furnished by Buyer. Caudill further warrants that the goods are fit for ordinary purposes only. CAUDILL MAKES NO WARRANTY AS TO THE FITNESS OF THE GOODS FOR ANY PARTICULAR PURPOSE OR THE RESULTS TO BE OBTAINED FROM THEIR USE BY BUYER EITHER ALONE OR IN COMBINATION WITH OTHER SUBSTANCES. CAUDILL MAKES NO OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE GOODS.

(*Id.*). However, Caudill Seed provided a different set of warranties for its sale of seed; the Terms of Sale explained:

SEED PURCHASES: Caudill warrants in the extent of the purchase price only that the seeds are as described on the invoice, the bag and/or the tag attached thereto, within recognized tolerances. Caudill gives no other warranty, express or implied, for the merchantability or fitness of the seeds for any particular purpose, or any other warranty against loss of yield due to any cause, including environmental conditions, disease, insects, water conditions, soil conditions, chemical applications, farming practices, or the response of this seed to any such conditions. Caudill shall not be liable for incidental or consequential damages. Caudill recommends that a five (5) pound sample of the seed be tested by Buyer in similar conditions to those for which the seed will be used.

(*Id.*).

29. Despite the specific Terms of Sale, Defendants allege that Caudill Seed and Rose Seeding had a fifteen year history of doing business in which "[o]n numerous previous occasions when seed failed to germinate Caudill would recognize the failure and either discount or replace the non-conforming

seed as necessary to remediate the job site in question."[4]  (Response at 6 n.16).

30.  Caudill Seed filed suit in this case on July 21, 2009.[5]  Caudill Seed alleges that Rose Seeding and Mark Rose breached their contract with Caudill Seed by failing to pay for product that was accepted, that Caudill Seed is entitled to compensatory damages in the amount owed for the product, that Mark Rose is personally liable, that Caudill Seed is entitled to interest, and that Caudill Seed is entitled to attorney's fees and costs.

31.  Defendants filed an Answer and Counterclaim arguing that Caudill Seed breached the contract by selling Defendants seed that it claimed was certified, but was not, in fact, certified.  Defendants also allege that Caudill Seed breached the warranty of merchantability by selling seed that failed to germinate in a quantity expected in accordance with industry standards. Furthermore, Defendants argue that they are not obligated to pay for the non-seed product because it was directly related to the application of the seed, and that when the seed failed to germinate, the non-seed product was rendered

---

[4]The court notes that parties' course of dealings can be used to give meaning to or supplement the terms of an agreement.  Ind. Code § 26-1-1-205.  However, Defendants in this case only made note of this alleged prior course of dealing in passing within a footnote and provided no evidence whatsoever to support this allegation.  In this instance, the court concludes that there is no evidence of a prior course of dealing in which Caudill Seed agreed to remediate prior problems with germination.

[5]Caudill Seed has since amended its Complaint on March 22, 2010. Additionally, the parties entered into an Agreed Order dismissing certain portions of Caudill Seed's Amended Complaint and Defendants' Counterclaims. Consequently the court will only address those claims and those parties that remain.

useless.

32.  Caudill Seed filed this Motion for Summary Judgment arguing that they are entitled to judgment as a matter of law on all of their claims against Rose Seeding and Mr. Rose.  Specifically, Caudill Seed argues that it is entitled to summary judgment on its breach of contract claim because Rose Seeding accepted delivery of both the seed and non-seed product and that Rose Seeding never rejected any of the relevant purchases.  Having examined the arguments of the parties and the relevant legal authorities the court concludes that Caudill Seed's motion must be GRANTED.

### III.  Summary Judgment Standard

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  When ruling on the motion, the Court must construe the evidence in the light most favorable to the nonmoving

party and draw all reasonable inferences therefrom in that party's favor.  *Id.* at 255.  If the nonmoving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e); *see also Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999).  Lastly, the moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

## IV.    Analysis

### A. Application of State Substantive Law

This is a suit brought pursuant to the court's diversity jurisdiction. While a federal court sitting in diversity jurisdiction shall apply its own procedural laws, it must apply the substantive laws of the state in which it sits. *First Nat. Bank and Trust Corp. v. American Eurocopter Corp.*, 378 F.3d 682, 689 (7th Cir. 2004).  This Court must, therefore, apply Indiana substantive law including Indiana's choice of law rules concerning contracts.  In this case, the parties agree that Indiana contract law controls this dispute.

### B. Mark Rose is Individually Liable

As an initial matter, the court must determine to what extent any liability on behalf of Rose Seeding extends to Mark Rose individually.  Mr. Rose does not dispute that he signed a credit application in which he stated that he "certifies . . . that I (we) fully understand the credit terms as stated on the face and back of this form.  In consideration of the extension of credit by Caudill to

[Rose Seeding], I (we) agree to be personally and individually bound on all amounts due Caudill." (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 2). Defendants do not argue that this was an invalid guaranty.

In Indiana, the interpretation of a guaranty is governed by the same rules applicable to other contracts. *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1261 (Ind. Ct. App. 1993). As the Indiana Court of Appeals has explained:

> In construing a guaranty, this court must give effect to the intentions of the parties, which are to be ascertained from the language of the contract in light of the surrounding circumstances. Generally, the nature and extent of a guarantor's liability depends upon the terms of the contract, and a guarantor cannot be made liable beyond the terms of the guaranty. Nevertheless, the terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within their terms.

*Bruno v. Wells Fargo Bank, N.A.*, 850 N.E.2d 940, 945-46 (Ind. Ct. App. 2006)(internal citations omitted).

In this case, given that Defendants do not dispute the validity of this guaranty, and given that a reading of the guaranty indicates that it was the intentions of the parties that Mark Roes was agreeing to be "personally and individually bound on all amounts due Caudill" the court concludes that this was a valid and enforceable guaranty. To hold otherwise would be to loosely interpret the guaranty in a manner so as to relieve the guarantor (Mark Rose)

of liability fairly within the terms of the guaranty.  Indiana law does not permit such a loose interpretation of a guaranty, and the court, therefore, concludes that Caudill Seed's Motion for Summary Judgment on the issue of personal liability must be GRANTED.

## C. Seed Product

Caudill Seed asserts that it is entitled to judgment as a matter of law on its breach of contract claim because Rose Seeding was provided with a reasonable amount of time to inspect the seed and, within that reasonable time frame, never rejected the seed.  Additionally, Caudill Seed argues that, when Rose Seeding accepted the seed after having the opportunity to inspect it, Rose Seeding waived its argument that the seed was not certified.

1. No evidence that Rose Seeding rejected the seed

Indiana has adopted the Uniform Commercial Code in the area of sales. Indiana law provides that "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Ind. Code § 26-1-2-204.  In addition, the parties duties after entering into a contract are described in Section 26-1-2-301 as follows: "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract."

In this case, there is no dispute that Caudill Seed transferred and delivered the seed to Rose Seeding.  The only question, then, is whether or not

Rose Seeding properly rejected the seed.  Under Indiana law,

> (1) Acceptance of goods occurs when the buyer:
> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
> (b) fails to make an effective rejection (IC 26-1-2-602(1)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Ind. Code § 26-1-2-606.  Additionally, "[r]ejection of goods must be within a reasonable time after their delivery or tender.  It is ineffective unless the buyer seasonably notifies the seller."  Ind. Code § 26-1-2-602.

The court must, therefore, determine what amounts to a "reasonable opportunity to inspect the goods" and a "reasonable time" to reject them. Caudill Seed argues that the Terms of Sale provide such a reasonable time: ten days.  It is true that the Terms of Sale call for a ten-day period in which Rose Seeding shall reject the "goods" or otherwise it will have "irrevocably accepted the goods."  (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 10).  However, the court notes that the Terms of Sale clearly differentiate between "goods" and "seeds," providing for different warranties pertaining to goods than the warranties pertaining to seeds.  (*Id.*).  As a result, the court concludes that the ten-day period for acceptance/rejection of the seeds is not the appropriate amount of time.  Instead, the court concludes that the concluding sentence of the section of the Terms of Sale entitled "Seed

Purchases" which explains that "Caudill recommends that a five (5) pound sample of the seed be tested by Buyer in similar conditions to those for which the seed will be used" provides the appropriate "reasonable" length of time in which Rose Seeding could have properly rejected the seed. Had Rose Seeding tested the seed at issue in this case, determined that it did not germinate properly, and then notified Caudill Seed that it was rejecting the seed, then the court would have likely found such a rejection to have been proper. That, however, is clearly not what occurred here. Instead, Rose Seeding used the seed at issue in this case and only later alleged that the seed did not germinate properly. Rose Seeding's actions were inconsistent with a rejection of the seed. There is no evidence of "an effective rejection" as described in Section 26-1-2-602(1) of the Indiana Code. Therefore, Rose Seeding breached the various contracts between it and Caudill Seed when it failed to pay for the seed. Caudill Seed is entitled to judgment in the amount of Sixty-nine Thousand, Five Hundred Forty-five dollars, and Ninety-four Cents ($69,545.94) for seed.

2. Caudill Seed disclaimed any warranty of merchantability

While Rose Seeding failed to properly reject the seed and, therefore, was obligated to pay the contract price, Rose Seeding could still prevail on its Counterclaim against Caudill Seed if it were able to show that Caudill Seed's actions amounted to a breach of contract. Rose Seeding claims that, by shipping seed that did not germinate in a quantity expected in accordance with industry standards, Caudill Seed breached the warranty of merchantability.

-14-

Indiana's version of the Uniform Commercial Code defines the implied warranty of merchantability as follows:

> (1) Unless excluded or modified (IC 26-1-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
> (2) Goods to be merchantable must at least be such as:
> (a) pass without objection in the trade under the contract description; and
> (b) in the case of fungible goods, are of fair, average quality within the description; and
> (c) are fit for the ordinary purposes for which such goods are used; and
> (d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
> (f) conform to the promises or affirmations of fact made on the container or label if any.
> (3) Unless excluded or modified (IC 26-1-2-316), other implied warranties may arise from course of dealing or usage of trade.

Ind. Code § 26-1-2-314. Section 26-1-2-316 provides for how to reconcile possible inconsistencies in the warranty language within a contract. Specifically it explains that "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other." Ind. Code § 26-1-2-316. And, it further provides the manner in which the implied warranty of merchantability may be disclaimed; "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous . . . ."

*Id.*

Here, the court notes that, at first glance, the language in the "Warranties" section of the Terms of Sale in which Caudill Seed warrants that the goods are of merchantable quality appears to conflict with language in the "Seed Purchases" section in which Caudill Seed "gives no other warranty, express or implied, of the merchantability . . . of the seeds." However, Section 26-1-2-316 instructs the court to construe such perceived conflicts as consistent wherever "reasonable." In this case, the decision to treat "goods" and seeds differently is a reasonable distinction. Whether or not seeds germinate is dependent upon many factors including the weather, watering, the quality of the fertilizer used, the quality of the soil, the knowledge of the landscaper, and presumably other factors as well. As a result of these uncertainties, it was reasonable for Caudill Seed to provide stronger warranties for the "goods" than they provided for the seed. Thus, the court will read the two warranty sections of the Terms of Sale as consistent with each other. Additionally, the court concludes that Caudill Seed's disclaimer of the warranty of merchantability was conspicuous and also specifically mentioned merchantability. Caudill Seed, therefore, properly disclaimed the warranty of merchantability with regard to the seeds, and Defendants' claim that Caudill Seed breached the warranty of merchantability is without merit.

3. Rose Seeding waived any claim concerning improper certification

Defendants' final argument for why Caudill Seed breached the parties' contract is that Caudill Seed sold seed that it claims was certified but was not actually certified. They state in their Response:

> The Rose Defendants reasonably believe that a portion of the seed received from Caudill was not incompliance [sic] with the specifications of the order; to-wit, that it was not certified. Upon review of several seed tags provided to the Rose Defendants to fulfill seed orders, it was discovered that Caudill provided seed that did not conform to the order, to-wit, it was not certified according to either Kentucky or Indiana specifications. (Exhibits F) Specifically, the tags did not exhibit the state seal as having been certified when certified seed was ordered.

(Response at 7-8). Indeed the Terms of Sale do indicate that "Caudill warrants to the extent of the purchase price only that the seeds are as described on the invoice, the bag and/or the tag attached thereto, within recognized tolerances." (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 10). Nevertheless, Defendants waived any argument that the seed was not certified when it accepted the seed. Section 26-1-2-607 of the Indiana Code provides that "[a]cceptance of goods by the buyer precludes rejection of the goods accepted, and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured . . . ." Here, by planting seeds that were *arguably* not certified, Rose Seeding clearly signified its

intention to accept non-conforming goods.[6]  And, as discussed above, Rose

Seeding failed to reject the seed after having a reasonable opportunity to

inspect them.  Ind. Code § 26-1-2-606.  Because Defendants took possession of

the seeds, had a reasonable opportunity to inspect them to determine if they

were certified, and even after this reasonable period still planted them, thereby

accepting the allegedly non-conforming seed, Defendant has waived its

counterclaim for breach of contract.

## D. Non-Seed Product

Defendants argue that they are not liable for the amounts they owe

concerning the non-seed product that was purchased from Caudill Seed.  The

gist of their argument is that the fertilizer, tackifier, and netting were directly

related to the application of the seed, and that when the seed failed to

germinate, this non-seed product was rendered useless.  They argue that once

the seed failed to germinate, they were required to purchase new non-seed

product to remediate 14 projects that had failed.  Rose Seeding essentially

concedes that it accepted the non-seed product and that there were no defects

in the non-seed product.  Therefore, Rose Seeding is liable for the Forty-three

Thousand, One Hundred Thirty-one Dollars, and Thirty-three Cents

---

[6]To be "certified" seed, the recipient needs only to look at the tag attached to the
seed bag.  A reasonable time to determine whether seed was "certified" by inspecting
the bag would be something less than the time necessary to plant a test plot.  There is
no evidence before the court that Rose Seeding did not have sufficient opportunity to
inspect the bag tags before they applied the seed.

($43,131.33) worth of non-seed product that it did not pay for.[7]

## E. Attorney's Fees

Caudill Seed also alleges that it is entitled to attorney's fees under the contract. The Credit Application signed by Mark Rose indicates that "IN THE EVENT THE ACCOUNT IS PLACED IN THE HANDS OF AN ATTORNEY FOR COLLECTION, AFTER DEFAULT, BUYER AGREES TO PAY THE COST OF COLLECTION, INCLUDING ATTORNEY'S FEES OF NOT LESS THAN 20%." (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 2). In Indiana, parties to a lawsuit generally must pay their own attorney's fees unless such a fee is authorized by statute, agreement, or stipulation. *Holliday v. Crooked Creek Villages Homeowners Assoc., Inc.*, 759 N.E.2d 1088, 1095 (Ind. Ct. App. 2001). "Accordingly, a contract allowing for recovery of attorney fees is enforceable, if the contract is not contrary to law or public policy." *Dempsey v. Carter*, 797 N.E.2d 268, 275 (Ind. Ct. App. 2003). Here, the court finds no legal or public policy reason why the contract permitting an award of attorney's fees should be unenforceable. Rose Seeding accepted both the seed and non-seed product from Caudill Seed. Yet, Rose Seeding never

---

[7]Even if the court had determined above that Caudill Seed's shipment of allegedly uncertified seed amounted to a breach of contract or that Caudill Seed had breached the warranty of merchantability, Defendants would still be liable for the non-seed product. The Terms of Sale explicitly state that Caudill Seed "shall not be liable for incidental or consequential damages." (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 10). Any additional non-seed product that Rose Seeding was forced to purchase in order to remediate would qualify as consequential damages not recoverable under the contract.

paid for the product despite using it in numerous projects. Defendants argue that after Rose Seeding notified Caudill Seed of the defective seed, Caudill Seed was obligated to negotiate in good faith to resolve the conflict. The court disagrees. Caudill Seed fulfilled its contractual obligations by delivering the seed and non-seed product to Rose Seeding which Rose Seeding then accepted. Caudill Seed had no further contractual obligations. Instead it was Rose Seeding that had the contractual obligation to pay for the product after it accepted it. By failing to fulfill its contractual obligations, Rose Seeding (and Mark Rose individually) exposed itself to the attorney's fee component under the contract.

Having determined that Caudill Seed is entitled to attorney's fees, the court instructs Caudill Seed to submit a detailed Bill of Costs itemizing the attorney's fees sought for its attempts at collection of the debt owed by Defendants.

## F. Pre- and Post-Judgment Interest

Caudill Seed also seeks interest on the unpaid debts pursuant to the Credit Application and the Invoices. The Credit Application signed by Mark Rose provides that payment is due 30 days from the date of an invoice. (Memorandum in Support of Caudill Seed's Motion for Summary Judgment at Ex. 2). The Invoices sent to Rose Seeding also included notice that "A service charge of 2% per month (24% annual rate) will be added to all balances which

are 30 or more days past due." (*See Id.* at 3-7). An award of pre-judgment interest is warranted in a breach of contract claim if the amount of the claim rests upon a simple calculation and the terms of the contract make the claim readily ascertainable; in such an instance an award is required and not a matter of discretion. *Hayes v. Chapman*, 894 N.E.2d 1047, 1054-55 (Ind. Ct. App. 2008); *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 169 (Ind. Ct. App. 2004). However, as Caudill Seed concedes, the Indiana Code sets the pre-judgment interest rate at eight percent (8%) per annum "from the date an itemized bill shall have been rendered and payment demanded on an account stated . . . ." Ind. Code § 24-4.6-1-102. Consequently, Caudill Seed is entitled to eight percent interest per annum beginning 60 days after the date of each of the invoices listed above in paragraphs 5-20 which Rose Seeding did not pay.

Finally, pursuant to Section 24-4.6-1-101 of the Indiana Code, Caudill Seed is entitled to post-judgment interest in the amount of eight percent (8%) per annum.

## V.    Conclusion

For the reasons outlined above, Caudill Seed's Third Motion for Summary Judgment is **GRANTED**. Defendants' Counterclaim is **DISMISSED**. Judgment is entered in favor of Caudill Seed in the amount of One Hundred Twelve Thousand, Six Hundred Seventy-seven Dollars, and Twenty-seven Cents ($112,677.27) for seed and non-seed product. Caudill Seed is also entitled to

interest as discussed above; counsel for Plaintiff shall provide a proposed calculation of pre-judgment interest within ten (10) days of this Entry. Finally, Caudill Seed is entitled to attorney's fees associated with collection of this debt and is **ORDERED** to file a Petition for Attorney's Fees and Bill of Costs within ten (10) days of this Entry.

A separate Final Judgment shall enter after the court has reviewed the interest, attorney's fees, and costs submissions.

**IT IS SO ORDERED**.

**Dated**: 10/06/2010

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana


Copies to:


John T. Byrd
BYRD LAW FIRM
jbyrd@byrdlegal.com

Scott C. Byrd
BYRD LAW FIRM
sbyrd@byrdlegal.com

J. Clayton Culotta
CULOTTA & CULOTTA LLP
clay@culottalaw.com

Stephen T. Naville
LORCH & NAVILLE, LLC
snaville@lorchnaville.com

John R. Vissing
JOHN R. VISSING, LLC
jack_vissing@vissinglaw.com